Louis C. TALARICO, II, Plaintiff

v.

MARATHON SHOE COMPANY,
Defendant

No. CIV. 00–239–PC.

United States District Court,
D. Maine.

Jan. 25, 2002.

James G. Goggin, Verrill & Dana, Portland, ME, for Louis C Talarico, II, plaintiff.

Sidney St. F. Thaxter, Curtis, Thaxter, Stevens, Broder, & Micoleau, Portland, ME, Shawnell Williams, Esq., Kegler, Brown, Hill & Ritter, Columbus, OH, Stephen E. Chappelear, Esq., Hahn, Loeser & Parks, LLP, Columbus, OH, for Marathon Shoe Company, defendant.

**MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND TO DISMISS AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT**

GENE CARTER, District Judge.

Pending before the Court are Defendant's Motion for Summary Judgment and Motion to Dismiss (Docket No. 25), Defendant's Motion to Strike Plaintiff's Expert Report (Docket No. 26), Plaintiff's Motion to Exclude Defendant's Expert Report (Docket No. 30), Defendant's Motion in Limine With Request for Markman Hearing (Docket No. 31), Defendant's Motion to Strike Plaintiff's Supplemental Expert Report (Docket No. 33), Plaintiff's Response to Defendant's Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment (Docket No. 34), and Defendant's Motion to Strike Plaintiff's Cross–Motion for Summary Judgment (Docket No. 46).

## I. FACTS

Louis Talarico, II, a doctor of podiatric medicine, is the inventor and owner of United States Patent No. 4,578,882 ("the '882 patent") for shoe soles, which was issued on April 1, 1986. The language of Claim 1 of the '882 patent states:

In an article of footwear for use with a foot, said article having an upper portion and a sole, said sole having a forefoot and a rearfoot portion, said sole forefoot portion having a medial aspect and a lateral aspect, said sole forefoot portion being of varying thickness across the width thereof such that said sole slopes at an angle upwardly from said lateral aspect to said medial aspect to provide an inclined surface of greater thickness at said medial aspect than at said lateral aspect to compensate said forefoot in its naturally inverted angulation and to maintain the normal alignment, position, motion and function of the entire foot during use of said article of footwear, and wherein said inclined surface compensates the forefot (sic) beneath the base and shafts of the metatarsal bones diagonally, the metatarsal-phalangeal joints (the ball of the foot), and the toes, giving the area beneath the first metatarsal-phalangeal joints (the big toe joint) the greatest elevation, and wherein said sole rearfoot portion is of constant thickness, such that the rear portion of the foot is allowed to act as an effective shock absorber when coming into contact with the ground, and wherein said inclined surface has a slope at a maximum angle of 8 degrees plus or minus amounts up to 6 degrees.

Complaint (Docket No. 1), Ex. 1, '882 patent, col. 10, ln. 10–34. In his Complaint, Dr. Talarico claims that his patent protects:

a forefoot compensating technology for footwear which compensates for the foot's natural anatomy and the slight inherent angulations of the soles of the feet relative to the flat surfaces that most feet function on by providing materials of different thicknesses in the forefoot area of the footwear sole to provide varus (slightly inverted) forefoot compensation.

Complaint ("Comp.") at 2.

Michael Pryce, M.D., also obtained a patent on shoe insoles, U.S. Patent No. 5,327,663 ("the '663 patent"), on July 12, 1994. In his '663 patent, Dr. Pryce compares his invention to Dr. Talarico's '882 patent: "as in Talarico's model, the forefoot is compensated by a wedge." Black Affidavit ("Aff.") (Docket 34), Ex. 1, '663 patent, col. 2, ln. 5–7. Dr. Pryce differentiates his invention from Dr. Talarico's with the following language: "None of the prior art is concerned with the combina-

tion of a raised wedge for the forefoot *and midfoot,* while maintaining the heel in its normal position flat on the ground." Black Aff., Ex. 1, '663 patent, col. 2, ln. 12–15 (emphasis added). The patent further states, "The midfoot portion starts at the base of the heel and immediately rises forward to support the midfoot ... The present invention's support of the midfoot is a distinguishing feature over [the '882 patent], since Talarico has no such midfoot support." '663 patent, col. 2, ln. 32–37. Claim 1 of the '663 patent states:

> A corrective foot insole in combination with footwear having a predetermined length and width, and forefoot, midfoot, and heel portions, comprising: a raised forefoot portion of uniform thickness extending approximately half the width of the footwear such that it extends under the two medial toes, the forefoot portion extending from the front of the footwear to a distance less than the length of the footwear, such that it terminates in front of the heel portion of the footwear, and being substantially the same width throughout its length as said portion under the two medial toes of the wearer; and a midfoot portion being of substantially elliptical shape for supporting the metatarsal of the wearer and said midfoot portion of said insole being attached to the upper face of said raised forefoot portion of said insole and extending from the front of said midfoot portion of said footwear to a distance less than the length of the footwear such that it terminates in front of the heel portion.

Black Aff., Ex. 1, '663 patent, col. 4, ln. 15–34. Dr. Pryce is the sole owner of Defendant Marathon Shoe Company, and Marathon's only product is the Flat Foot® Insoles, which employ Dr. Pryce's patented technology. Pryce Dep. at 11.

Dr. Talarico purchased a pair of "Flat Foot® Insoles" manufactured by Defendant Marathon Shoe Company ("Marathon") from a store in Daytona Beach, Florida in March 1999. The product purchased by Dr. Talarico contained two insoles and written instructions in a pamphlet and on the outside of the box including, *inter alia,* the following statements: "Flat Foot® is a registered trademark of the Marathon Shoe Co. U.S. Patent # 5,327,663 Patented in 43 countries MADE IN USA© Copyright 1998, SecondWind Products, Inc. in cooperation with Marathon Shoe Co."[1] Docket No. 5, Ex. C. After examining the insole, as well as the information on the pamphlet insert and packaging describing many of its characteristics, Dr. Talarico formed the belief that the Flat Foot® Insoles infringed his '882 patent.

## II. DISCUSSION

The issues presented by Defendant's Motion for Summary Judgment and to Dismiss and Plaintiff's Cross–Motion for Partial Summary Judgment of Infringement request the Court to construe the language of the patent claims and to determine whether or not the accused product infringes the '882 patent. Plaintiff Talarico argues that Defendant Marathon's Flat Foot® Insoles infringe his '882 patent. Specifically, Plaintiff alleges direct infringement, contributory infringement and inducement of Defendant's customers to use replacement insoles in an infringing manner. Defendant argues noninfringement. The parties have also moved to strike and exclude each other's expert reports.

A patentee may prove infringement literally or under the doctrine of

1. Another box of Defendant Marathon's product, Flat Foot ® Insoles, was bought from Sportshoe Center in Scarborough, Maine by Plaintiff's attorneys and is included as part of the record in this case. *See* Docket No. 5, Exhibit C.

equivalents. HAIG § 63.4 at 920. Infringement is literal or direct "when every limitation recited in the patent claim is present exactly in the accused product." HAIG, § 63.4(a) at 921 (citations omitted). Infringement under the doctrine of equivalents exists where the accused product "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. 854. An act may constitute (1) "direct infringement" of a patent, *see* 35 U.S.C. § 271(a); (2) "inducement" of others to engage in direct infringement, *see* 35 U.S.C. § 271(b); or (3) "contributory infringement," such as the sale of a product specifically adapted to a patented use having no other commercial use. *See* 35 U.S.C. § 271(c); *see also* HAIG, § 63.4 at 921, 922–23 (citations omitted). In order "[t]o prove active inducement of infringement under 35 U.S.C. § 271(b), the plaintiff must show both (1) an act by the defendant actually calculated to induce another to infringe, and (2) the culmination of the defendant's acts in a direct infringement by another." *Gen–Probe*, 926 F.Supp. at 960. A defendant may be liable as a "contributory infringer" for selling a component of the patented invention that is specially designed for the infringing purpose and is not a staple article of commerce suitable for substantial non-infringing use. *See Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 198, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980).

### A. Motion to Dismiss

A motion to dismiss under Rule 12(6)(b) requires the Court to decide whether the facts outlined or reasonably foreshadowed in the complaint could entitle the plaintiff to relief .... Even under liberal notice pleading, the plaintiff [in a patent infringement suit] must provide facts that "outline or adumbrate" a viable claim for relief, not mere boilerplate

sketching out the elements of a cause of action.

*Gen–Probe, Inc. v. Amoco Corporation, Inc.*, 926 F.Supp. 948, 961 (S.D.Cal.1996) (citations omitted). A complaint must contain "allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial." *Id.* (citing 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 at 156–59 (1990)). Plaintiff claims that Defendant's product literally infringes his patent, that Marathon induces its customers to use the product in an infringing manner, and that Defendant contributes to its customers infringement by offering Flat Foot® Insoles for sale for use in a shoe. Inferences fairly drawn from Plaintiff's Complaint and subsequent pleadings clearly indicate his theories of infringement as well as facts to be introduced at trial that may entitle Plaintiff to relief on all his claims. Accordingly, the Court will deny Defendant's Motion to Dismiss.

### B. Motions for Summary Judgment

Although infringement is a question of fact, *see Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), "[s]ummary judgment is as appropriate in a patent case as in any other ... [w]here no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law." *Barmag Barmer Maschinenfabrik A.G. v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed.Cir. 1984). Similarly, "[e]ntry of summary judgment of non-infringement in favor of a party accused of patent infringement is proper when there is no genuine issue of material fact and, given proper construction of the patent, a finding of infringement is impossible." *Biomedical Polymers, Inc. v. Evergreen Industries, Inc.*, 976 F.Supp. 98, 100 (D.Mass.1997) (citing

*Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 884 (Fed.Cir.1986); *see also K–2 Corporation v. Salomon S.A.,* 191 F.3d 1356, 1362 (Fed.Cir.1999)) (" 'Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over [claim interpretation], the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgement.' ") (quoting *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996)). Summary Judgment should be denied where genuine issues of material fact remain in dispute. *See* Fed. R.Civ.P. 56(c).

■ The determination of infringement is a two-step inquiry, beginning with a proper claim construction. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) *(en banc), aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *see also* ROBERT L. HAIG, 4 BUSINESS AND COMMERCIAL LITIGATION IN FEDERAL COURTS § 63.4 at 919–20. "An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent." *K–2 Corporation v. Salomon S.A.,* 191 F.3d 1356, 1362 (Fed.Cir.1999) (citations omitted). "A proper claim interpretation requires an examination of the patent claims, the written description of the patent (including the specification and the drawings), and the prosecution history of the patent." [2] HAIG, § 63.3 at 918 (citing *Vitronics v. Conceptronic, Inc.,* 90 F.3d 1576, 1582–83 (Fed.Cir.1996)); *see also Markman,* 52 F.3d 967. The second step of the analysis involves the comparison of

the accused product to the properly construed claim by the trier of fact. *See Markman,* 52 F.3d 967. Because the relevant aspects of the accused device's structure and operation are genuine issues of material fact which remain disputed in this case, the Court will deny both summary judgment motions.

### 1. Claim Construction

■ The threshold inquiry for construing a patent claim as a matter of law is to "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics,* 90 F.3d at 1582. Terms in a claim are "generally given their ordinary and customary meaning" unless the patentee has clearly stated special definitions in the patent specification or file history. *Id.* Second, it is necessary to review the patent specification, which is usually "dispositive; it is the single best guide to the meaning of a disputed term." *Id.* "Third, the court may also consider the prosecution history of the patent, if in evidence." *Id.* Additionally, "a patent is not to be limited to the preferred embodiments shown in the specification." *Ziegler v. Phillips Petroleum Company,* 483 F.2d 858, 879 (5th Cir.1973), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973) (citing *Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908)).

The subject of Claim 1 of the '882 patent consists of a shoe sole to provide support to the foot. Two terms within Claim 1 remain disputed by the parties: "greatest elevation" and "constant thickness." The language of Dr. Talarico's Claim 1 states:

> In an article of footwear for use with a foot, said article having an upper portion and a sole, said sole having a forefoot

---

2. Defendant has moved for a *Markman* hearing. Because the Court is able to construe the patent without a hearing, it will deny Defendant's request for a *Markman* hearing.

and a rearfoot portion, said sole forefoot portion having a medial aspect and a lateral aspect, said sole forefoot portion being of varying thickness across the width thereof such that said sole slopes at an angle upwardly from said lateral aspect to said medial aspect to provide an inclined surface of greater thickness at said medial aspect than at said lateral aspect to compensate said forefoot in its naturally inverted angulation and to maintain the normal alignment, position, motion and function of the entire foot during use of said article of footwear, and wherein said inclined surface compensates the forefot [sic] beneath the base and shafts of the metatarsal bones diagonally, the metatarsal-phalangeal joints (the ball of the foot), and the toes, giving the area beneath the first metatarsal-phalangeal joints (the big toe joint) the greatest elevation, and wherein said sole rearfoot portion is of constant thickness, such that the rear portion of the foot is allowed to act as an effective shock absorber when coming into contact with the ground, and wherein said inclined surface has a slope at a maximum angle of 8 degrees plus or minus amounts up to 6 degrees.

Comp., Ex. 1, '882 patent, col. 10, ln. 10–34. This claim contains a number of elements: (1) a raised forefoot portion (shown in Figure 7), described as a "forefoot compensating wedge," sloping upward from the lateral aspect to the medial aspect to maintain the "naturally inverted angulation" of the forefoot, with the "greatest elevation" beneath the first metatarsal-phalangeal joints (the big toe joint), wherein "the relative thickness of the forefoot compensation at the medial aspect of the footwear is always thicker than that at the lateral aspect of the forefoot of the footwear by the prescribed amount," col. 5, ln. 14–18, *i.e.,* "a maximum angle of 8 degrees plus or minus amounts up to 6 degrees"; (2) a rear or heel portion of "constant thickness, such that the rear portion of the foot is allowed to act as an effective shock absorber when coming into contact with the ground" and (3) a number of aspects regarding angular relationships and inclined surfaces with "a maximum angle of 8 degrees plus or minus amounts up to 6 degrees." col. 10, ln 29–34. One preferred embodiment of the patent, a running shoe, incorporates the angular compensation directly into the midsole portion of the shoe such that,

> The midsole 14, as shown, tapers on the lateral aspect (14L) from the heel towards the toe 16 as can be seen in Fig. 2. This longitudinal taper of the midsole... only on the lateral aspect [from the heel toward the toe], is created by the forefoot compensating wedge of the present invention and it is in addition to the taper of the conventional heel elevation 17. This added longitudinal taper created on the lateral aspect is integral to the present invention and desirable for increased efficiency of walking or running.

Comp., Ex. 1, '882 patent, col. 7, ln 4–7. Dr. Talarico contemplates that his device will frequently be used in conjunction with "a conventional prior art heel elevation," wherein the patent describes an optional feature, a longitudinal taper or bevel from heel to toe, which "tapers on both the medial and lateral aspects of the footwear." This optional longitudinal taper "creates even greater heel lift and elevation of the rearfoot in addition to that of the conventional heel lift." Comp., Ex. 1, '882 patent, col. 5, ln. 57–59. The elevation increases from lateral to medial aspect, "maintain[ing] the normal alignment, position, motion and function of the entire foot...[, however, t]his longitudinal taper ... is not integral to the present invention." Comp., Ex. 1, '882 patent, col. 6, ln. 66–68.

### a. Greatest Elevation

██ The parties dispute the construction of the term "greatest elevation" in Plaintiff's patent. Defendant argues that the term "greatest elevation" applies to the entire sole or insole and, therefore, a device with a greater elevation at some point other than under the big toe joint would not be covered by Plaintiff's patent. Plaintiff replies that the limitation of the "greatest elevation" is in comparison to other portions of the forefoot, and not in relation to the midfoot. Plaintiff urges that the claim language "greatest elevation" be construed to refer comparatively to only the forefront portion of the insole, not to refer to the entire insole or any other part of the sole. In other words, theoretically, a portion of the sole not covered by the elements of Claim 1 (*i.e.*, not the forefoot, the rearfoot, or the angulation) could be of greater elevation than the forefoot portion, and the device would still remain within the terms of the '882 patent. This is the logical, common-sense interpretation of the claim language. Dr. Talarico's patent describes a forefoot portion of the sole, designated in Figure 7 on Sheet 4 of the '882 patent, and a rearfoot portion. Claim 1 states, ". . . said inclined surface compensates the forefot [sic] . . . giving the . . . big toe joint . . . the greatest elevation. . . ." Comp., Ex. 1, '882 patent, col. 10, ln. 26–30. The Court finds that "greatest elevation" is a comparative term referring only to the forefoot portion of the sole as designated by Figure 7 on Sheet 4 of the '882 patent, which cuts diagonally into and does not include, for example, the portion of the sole designated in the '663 patent as the midfoot portion, where there is an "additional lift to the metatarsal by use of a supportive arch." Black Aff., Ex. 1, '663 patent, Abstract.

### b. Constant Thickness

██ The second disputed issue is the meaning of "constant thickness" in the rearfoot portion of Plaintiff's claim. Defendant argues that "constant thickness" means a uniform thickness and, therefore, it does not include a rearfoot portion of "varying thickness." Defendant Marathon Shoe Company's Opposition to Plaintiff's Cross Motion for Partial Summary Judgment of Infringement (Docket No. 51) at 2–3. Plaintiff claims that darker shading in figures 9–14 of his patent actually show a thicker edge around the entire rear portion of the sole. Because the Court assumes that Dr. Talarico did not intend to exclude a preferred embodiment of his own invention by the terms in Claim 1, the language in the specification describing the optional heel lift must be read in connection with the patent's description of a rear or heel portion of the sole of "constant thickness." Plaintiff argues that the term "constant thickness" means "only that the rearfoot portion of the sole must not change the angular relationship of the heel with the ground" and "that the rearfoot portion of the sole is not angled to provide any compensation in that area." Plaintiff's Opp. to Defendant's Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment of Infringement ("Plaintiff's Opp.") (Docket No. 34) at 9. The Court finds that the terminology "constant thickness" does not necessarily exclude a sole that is not entirely flat under the rearfoot.

The Court queries whether a contoured cup so distinguishes the angular relationships, however, as to remove it from the terms of Claim 1 of the '882 patent. Defendant urges the Court to construe the term "constant thickness" as excluding a "contoured-cup" edge around the heel. Plaintiff argues that his patent covers this type of "cupped" heel, and points to illustrations in his own patent to support this. Plaintiff alleges that his own drawings of a preferred embodiment include shading evidencing a slight cup shape. Plaintiff

claims that the depictions in Figures 9–14 actually portray a rearfoot sole portion with edges of a higher or thicker depth than the middle portion of the heel. Plaintiff cites to 37 C.F.R. § 1.84(m), which states: "Shading is used to indicate the surface or shape of spherical, cylindrical, and conical elements of an object." Additionally, 37 C.F.R. § 1.84(*l*) provides that "[l]ines and strokes [including shading] of different thicknesses may be used in the same drawing where different thicknesses have a different meaning." The Court construes the terms "constant thickness" to have their ordinary meaning of uniform thickness. "Constant thickness" read in the context of the remainder of the patent does not necessarily exclude a cupped shape edge. Plaintiff's statement, "that the rearfoot portion of the sole is not angled to provide any compensation" is not necessarily inconsistent with a tapering around the edge of the heel portion because, since the heel of a foot is rounded, a tapered edge would not necessarily affect the compensation or the angular relationship of the foot to the ground, but might simply enable the insole to be effectively placed into a shoe.

### c. Angulation

Dr. Pryce distinguished the '663 patent from Dr. Talarico's by the addition of a raised middle portion to an insole. Plaintiff avers that the language of the '882 patent and explanatory information do not mention any particular feature regarding "midfoot support" specifically, nor do they mention the midfoot portion of the insole whatsoever. Plaintiff further argues that his patent does not address the elevation of the midfoot region whatsoever, and that any midfoot portion of an insole is "irrelevant" to his invention. Plaintiff has stated that his patent contains no reference to a midportion of a sole or an insole, and therefore, an insole which met the forefoot and rearfoot elements of Plaintiff's Claim 1 but had a missing midportion or a large

midportion would not evade the scope of his Claim 1. Although Plaintiff's patent does not mention a midfoot portion of the sole *per se*, the Court queries whether such a dramatic improvement as a midfoot arch support, which arguably changes the angular relationships of the foot to the shoe and to the ground, is a significant enough addition to completely alter the effects of Plaintiff's forefoot and rearfoot portions, thereby evading the purpose and benefit of Plaintiff's invention, and therefore, the terms of his patented claims. The Court requires further assistance in construing the precise embodiments which would evade or come under the terms of Plaintiff's '882 patent.

### 2. Infringement: Factual Analysis

■ Beyond disputing the interpretation of the patent claim language, the parties also dispute whether or not Defendant's product infringes the patent. Plaintiff asserts that Defendant's patent is an improvement patent. Defendant has not denied this assertion. "[A]n improver does not escape infringing the dominant patent just by improving it;" an unlicensed improver is "an infringing improver." *Ziegler*, 483 F.2d at 879; *see also* HAIG, § 63.4(c) ("That a defendant itself is the patentee to an improvement of the plaintiff's patented technology does not shield the defendant from infringement liability"). Because "a patent conveys the right to exclude and not the right to practice what is claimed, ... anyone—including the owner of [an] improvement patent— must have a license from the owner of the basic patent." HAIG, § 63.4(c) at 922. Relevant statutory language provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to

the conditions and requirements of this title.

35 U.S.C. § 101 (1994). Nevertheless, Defendant denies that its Flat Foot® Insoles infringe Plaintiff's patent "because not every limitation or element set forth in [P]laintiff's patent claim is found in Marathon's insoles exactly as disclosed in the patent claim." Defendant Marathon Shoe Company's Pretrial Memorandum at 1. Dr. Talarico asserts that Defendant's Flat Foot® Insole exhibits the following characteristics:

> a) It was designed to be placed into an article of footwear having an upper portion and a sole, such as a running shoe; b) It has a forefoot and a rearfoot portion; c) Its forefoot portion has a medial aspect and a lateral aspect and a lateral aspect of varying thickness across its width; d) Its forefoot portion slopes upward from the lateral aspect to the medial aspect, providing an inclined surface of greater thickness at the medial aspect than at the lateral aspect; e) Its forefoot portion provides compensation to the forefoot in its naturally inverted angulation to maintain the normal alignment, position, motion and function of the entire foot during its use.

These statements are found in three places in the record: (1) Supplemental Expert Report of Louis C. Talarico, II, delivered to Defendant on October 2, 2001 (Docket No. 33), (2) Plaintiff's Statement of Undisputed Material Facts (Docket No. 35), and (3) Declaration of Louis C. Talarico, II (Docket No. 37) (hereinafter "Talarico Decl."). Defendant has not specifically denied these contentions, however, Defendant has moved for Plaintiff's Supplemental Expert Report to be stricken because it was untimely made. Additionally, Defendant avers that his insole does not have the "greatest elevation" underneath the big toe joint and that the rear heel portion of the insole is not of "constant thickness."

The Court takes these next two arguments in turn.

### a. Greatest Elevation

 The parties also dispute whether Defendant's product meets the terms of Plaintiff's forefoot wedge. Although the Court finds that "greatest elevation" is a comparative term referring relatively to the forefoot portion of the sole, i.e., the area of greatest elevation is defined in reference to the rest of the forefoot portion, this does not resolve the factual question presented. Plaintiff avers that "[t]he inclined surface of [the Flat Foot® Insole's] forefoot portion compensates beneath the base and shaft of the foot's metatarsal bones diagonally, the metatarsal-phalangeal joints (the ball of the foot), and the toes, giving the area beneath the first metatarsal-phalangeal joints (the big toe joint) the greatest elevation." Talarico Decl. at 2. Defense expert Ralph Jocke's scant descriptions grossly fail to provide the Court with enough information to determine infringement or non-infringement. Defendant has simply stated that his Flat Foot® Insole has the "greatest elevation" to the "rear of the big toe joint," i.e., in the midfoot portion of the insole. Plaintiff disputes that the area of greatest elevation in Defendant's insole is to the rear of the big toe joint. The Court herewith disposes of Defendant's contention by interpreting the "greatest elevation" language to refer only to the forefoot portion of the sole. Nevertheless, Plaintiff's mere conclusory observation fails to provide the Court with precise measurements or evidence that Defendant's product meets that elements of his claim and infringes his patent in the forefoot portion of his insole. This fact is not obvious to the ordinary viewer from inspecting the model insole provided to the Court as Exhibit 5. Because neither party has provided specific factual information regarding whether or

not Defendant's product has the greatest elevation, *within the forefoot portion,* under the big toe joint, summary judgment is precluded.

### b. Constant Thickness

Plaintiff and Defendant dispute whether or not the "contoured cup shape recess" of Defendant's product removes it from the terms of Plaintiff's patent. Plaintiff argues that the rear portion of Defendant's insole infringes his patent because it is of a constant thickness. Specifically, Plaintiff has stated that Defendant's Flat Foot® Insole's "rearfoot section is of constant thickness, such that the rear portion of the foot is allowed to act as an effective shock absorber when coming into contact with the ground." Talarico Decl. at 2. Marathon asserts that its device does not have a rear sole portion of "constant thickness." Defendant argues that because the heel portion of his insole is cupped on the edges, it is not of uniform thickness and does not, therefore, infringe the '882 patent. The only factual assertion made by Defendant is through his expert, Ralph Jocke. Although Jocke has no expertise whatsoever in shoes or feet, he observed: "A review of the Marathon Shoe insole shows that the rearfoot area is not of constant thickness. Indeed the rearfoot portion of the Marathon Shoe insole includes a contoured cup shape recess for accepting the heel of the user." Thaxter Aff. Ex. 2 (Docket No. 51) at 6. Defendant has failed to offer any foundation for Jocke's determination that the rearfoot portion is not of "constant thickness." Defendant also fails to offer any measurements that would help the lay observer make such a determination.

It does not appear to the Court to be obvious. Nor is the Court persuaded by Plaintiff's evidence that his patent necessarily covers a device with a "cupped shape" heel. (*See discussion supra* at p. 12.) The record does not provide sufficient technical information to determine whether the outer portion of the insole is indeed irrelevant to Dr. Talarico's patent and, thus, the Court is unable to discern factually whether the rearfoot portion of the insole is otherwise of constant thickness. The Court leaves for the factfinder to determine, preferably with the assistance of further expert testimony, whether or not the curved or "cupped" portion surrounding the rearfoot portion of the insole takes Defendant's product out of Claim 1 or whether Defendant's sole is of "constant thickness" in the relevant area to meet Claim 1.[3]

### c. Angulation

Although the Court is empowered to construe the claim language as a matter of law, an infringement determination is precluded when factual issues remain that were not illuminated by either party's pleadings or expert reports. In this case, neither party has conclusively put forth any evidence as to the extent of angulation of the insole that is necessary to keep a device within, or to remove it from, the terms and specifications of patent '882 Claim 1. The only factual analysis or comparison that has been provided to the Court are the aforementioned statements by Defendant's expert, Ralph Jocke, and Dr. Talarico's arguably untimely supplemental report. With regard to the angulation of Defendant's product, Dr. Talarico states: "The inclined surface of its forefoot portion has a slope at an angle between two and fourteen degrees." Talarico Decl. at 2. Dr. Talarico's statement is not precise enough to be dispositive of the issue be-

---

3. A factfinder might find, for example, that "constant thickness" refers only to the main part of the sole and the edges do not material-ly differ from the terms of Claim 1, but are merely to help the insole fit into a shoe.

cause angulation is still a genuine issue of material fact needing more evidentiary explication for its resolution.[4]

### III. Experts

The parties have filed three motions to exclude or strike each other's expert reports. Plaintiff's Motion to Exclude Defendant's Expert Report (Docket No. 30) is based on the fact that Jocke is a patent attorney and makes primarily legal conclusions, as opposed to factual observations, in his report. Defendant has moved to strike Plaintiff's original expert report (Docket No. 26) based on allegations that it does not meet the requirements of Rule 26 regarding expert opinion disclosures and also that it would not be admissible in evidence based on Rule 702. Defendant's Motion to Strike Plaintiff's Supplemental Expert Report (Docket No. 33) is based on the fact that it was untimely made, *i.e.,* after the expiration of the discovery deadline laid down by Magistrate Judge Cohen's Scheduling Order. The Court will deny Plaintiff's motion and Defendant's opposition to Plaintiff's original expert report. The Court will also deny Defendant's motion opposing Plaintiff's supplemental expert report asserting that it merely contains conclusory statements that Defendant's Flat Foot® Insoles meet the specifications of Plaintiff's patent.

### A. Plaintiff's Motion to Exclude Defendant's Expert Report

Plaintiff argues that Jocke's testimony should be excluded because he is an attorney and because he has no expertise in feet or shoes. Defendants do not aver that Ralph Jocke is an expert in shoe insoles—the fact that Jocke has been involved in obtaining hundreds of patents on wholly unrelated matters, primarily ATM technology, supports the assertion that he may be an expert in patent law, but that

gives no additional credence to any factual observations contained in his report. Plaintiff incorrectly asserts, however, that lawyers can never testify as experts in civil litigation, especially on the issue of patent infringement. *See Endress + Hauser, Inc. v. Hawk Measurement Systems Pty. Ltd.,* 122 F.3d 1040, 1042 (Fed. Cir.1997) (acknowledging that a patent lawyer can be an expert witness in a patent suit, but stating, "this court has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide"). The Federal Circuit has stated that, "the court has complete discretion to adopt the expert legal opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude it." *Biomedical Polymers,* 976 F.Supp. at 100 (D.Mass.1997), citing *Markman,* 52 F.3d 967; *see also Neupak, Inc. v. Ideal Manufacturing and Sales Corp.,* 168 F.Supp.2d 1012, 1015 (D.Minn.2001) (allowing expert testimony from a patent attorney for the patentee, stating that his lack of qualifications [in the technical field at issue in the case] bore "only on the weight the Court will accord his testimony"); *see also Biomedical Polymers, Inc. v. Evergreen Industries, Inc.,* 976 F.Supp. 98, 100 (D.Mass.1997) (whether to exclude expert testimony from an attorney is a matter for the court's discretion), citing *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *see also Acoustical Design, Inc. v. Control Elec. Co.,* 932 F.2d 939, 942 (Fed.Cir.1991). Although Jocke's testimony need not be excluded merely because he is a lawyer, the Court has the discretion to rely on his legal conclusions. While Defendant's "expert report" contains support for its con-

---

4. In order to resolve this issue, the Court anticipates that the parties will have to provide exact measurements in order for comparisons to be admissible at trial.

clusions, it contains scant factual information; nevertheless, it helps to articulate Marathon's defense. For the foregoing reasons, the Court will deny Plaintiff's Motion to Exclude Defendant's Expert.

### B. Defendants' Motion to Exclude Plaintiff's Expert Report

■ Defendant argues that Plaintiff's original expert opinion fails to satisfy the requirements set forth in Fed.R.Civ.P. 26 because it is conclusory and "vague" and fails to disclose a theory of infringement. Defendant Marathon claims that it could "not properly prepare to depose Mr. Talarico ... because at no point does his report guide the reader to the specific authority relied on for each assertion." Defendant Marathon Shoe Company's Motion to Strike (Docket No. 26) at 4. Defendant neglected to depose Dr. Talarico to its own detriment. Because the "expert" proffered by the Plaintiff is himself, Defendant strains credulity in asking the Court to excuse the failure to depose him.[5] Plaintiff's first "Expert Report" contains a conclusory assertion that his patent has been infringed, and that he based this opinion on "a comparison of Marathon's insoles with" the claim limitations of the '882 patent, and an analysis of the '663 patent. Thaxter Aff., Ex. 1 (Docket No. 28).

Defendant's principle objections to Plaintiff's expert report by Dr. Talarico are based on Rule 26. Defendant argues that a written report must be submitted detailing opinions to be expressed and the basis and reasons therefor; data considered; exhibits to be used; the expert's qualifications, publications, and compensation; and that Plaintiff's original expert report does not provide such information. Fed.R.Civ.P. 26(a)(2)(B). Rule 26(a)(2)(B) is limited to those experts retained specifically for trial. Although providing expert testimony, Dr. Talarico is not an expert "retained or specially employed to provide expert testimony in the case." Fed. R.Civ.P. 26(a)(2)(B). The applicable section of Rule 26 is (b)(4). The Advisory Committee Notes to Rule 26 for subsection (b)(4) requiring written reports for experts retained to testify at trial state:

> "[i]t should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness."

Advisory Committee Notes at 144 (West Ed.2001). Dr. Talarico's report is subject only to the requirements of Magistrate Judge Cohen's Order requiring that the parties designate experts and "Provide a Complete Statement of All Opinions to Be Expressed and the Basis and Reasons Therefor." Order (Docket No. 24).

### C. Defendant's Objection to Plaintiff's Supplemental Expert Report

■ Defendant also argues that Plaintiff failed to comply with Magistrate Judge

---

**5.** Defendant also argues that Dr. Talarico's initial "expert report" is deficient under Fed. R.Evid. 702 because the statements in the expert report are not "the product of reliable principles and methods." Defendant Marathon Shoe Company's Motion to Strike (Docket No. 26) at 5. Plaintiff responds that Dr. Talarico's "analysis did not involve any complicated scientific testing or extensive data." Plaintiff's Opposition to Defendant's Motion to Strike Plaintiff's Liability Expert Report (Docket No. 39) at 5. Defendant has requested that Dr. Talarico's testimony at trial be limited to the opinions expressed in his expert report. Opinion evidence to be admitted at trial must meet the requirements of the Federal Rules of Evidence. Should Dr. Talarico be Plaintiff's designated expert at trial, the Court may require more evidence regarding "reliable principles and methods" used to form his opinions.

Cohen's Discovery Order because it provided for expert reports to state their conclusions, as well as the reasons therefor by June 27, 2001. Plaintiff apparently provided a more detailed expert report only delinquently, *i.e.,* on October 2, 2001, after the deadline for expert disclosures had passed. Because the purposes of disclosure include, *inter alia,* to advise Defendant of likely evidence against it; because Defendant was already aware that Dr. Talarico was serving as an expert based on Plaintiff's first timely disclosure; and because the supplemental report merely parroted Claim 1 of the '882 patent and provided no further detail, evidence or explanation, Defendant was not prejudiced by the supplementation of Plaintiff's report.

## IV. CONCLUSION

It is **ORDERED** that each of the following motions be, and they are hereby **DENIED:** Defendant's Motion for Summary Judgment and to Dismiss (Docket No. 25), Defendant's Motion to Strike Plaintiff's Expert Report (Docket No. 26), Plaintiff's Motion to Exclude Defendant's Expert Report (Docket No. 30), Defendant's Motion *In Limine* With a Request For a *Markman* Hearing (Docket No. 31), Defendant's Motion to Strike Plaintiff's Supplemental Expert Report (Docket No. 33), Plaintiff's Cross–Motion for Partial Summary Judgment (Docket No. 34), Defendant's Motion to Strike Plaintiff's Cross–Motion for Partial Summary Judgment (Docket No. 46).